# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs February 12, 2019

## STACEY TYRONE GREEN v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Marion County**
No. 10454        Thomas W. Graham, Judge

_____

### No. M2018-00765-CCA-R3-PC

_____

A Marion County jury convicted the Petitioner, Stacey Tyrone Green, of one count of aggravated robbery, one count of burglary, one count of aggravated assault, and three counts of facilitation to commit aggravated robbery, burglary, and aggravated assault. The trial court imposed an effective sentence of fourteen years and six months in the Tennessee Department of Correction, and this court affirmed the trial court's judgment on appeal. *State v. Stacey Tyrone Green*, No. M2015-003230CCA-R3-CD, 2016 WL 381414, at *1 (Tenn. Crim. App., at Nashville, Feb. 1, 2016), *no perm. app. filed*. The Petitioner subsequently filed a petition for post-conviction relief alleging that he had received the ineffective assistance of counsel at trial, which was heard and denied by the post-conviction court. The Petitioner here appeals the ruling of the post-conviction court. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and TIMOTHY L. EASTER, JJ. joined.

Jared C. Smith, South Pittsburg, Tennessee, for the appellant, Stacey Tyrone Green.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; James Michael Taylor, District Attorney General; David O. McGovern, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Trial

This case arises from an armed robbery that took place in August 2013. In our opinion on the Petitioner's direct appeal, we briefly summarized the facts presented at the

Petitioner's July 2014 trial as follows: James Tucker, Terry Ballard, Paul Turner, Chris Timberlake, and a man named "Flake" were playing a card game in a garage owned by Big Daddy's Fireworks on August 15, 2013 at around 10:00 p.m. The players saw some men come through a chain link fence toward the garage. Their faces were partially covered by t-shirts. The men yelled for everyone to get down on the floor. Mr. Tucker noted that one man was holding a semi-automatic rifle, so he complied with their request. Mr. Timberlake refused, looking directly at the assailants. The men took money from the players.

Mr. Timberlake testified at trial that, before this event, he knew and did not have any problem with the Petitioner, whom he knew as "Little Stacey." He recognized the Petitioner as one of the assailants when the Petitioner pointed a gun at Mr. Ballard. He heard Mr. Ballard tell the Petitioner, who was robbing him, that they were cousins and that they knew each other. Mr. Timberlake also identified Mr. Gary as the man who had put the gun to his head during the robbery. Mr. Timberlake identified the Petitioner from a photographic lineup. Mr. Ballard also identified the Petitioner as the man who robbed him. He said that the t-shirt covering the Petitioner's face fell during the robbery, and he recognized the Petitioner as his cousin.

In an interview with law enforcement, the Petitioner claimed that he had been to Rudder's Market on the night of the robbery, where he bought chicken and pizza. However, Detective Matt Blansett of the Montgomery County Sheriff's Department testified that, when he looked at the surveillance video from the market and store receipts, he determined that the Petitioner had not been at the store at the time that the Petitioner claimed. The detective confirmed that Mr. Timberlake identified the Petitioner's photograph from a photographic lineup as being of one of the assailants. *Green*, 2016 WL 381414, at *3-5.

Based on this evidence, a Marion County jury convicted the Petitioner of one count of aggravated robbery, one count of burglary, one count of aggravated assault, and three counts of facilitation to commit aggravated robbery, burglary, and aggravated assault. The trial court sentenced the Petitioner as a Range II Multiple Offender to an effective sentence of fourteen years and six months in the Tennessee Department of Correction. The Petitioner appealed, contending that the trial court erred when it denied his motion to suppress evidence relating to the Petitioner's identification in a photographic lineup and that the evidence presented at trial was insufficient to support his convictions. This court affirmed the Petitioner's convictions. *Id.* at *1.

### B. Post-Conviction Facts

The Petitioner filed a *pro se* petition for post-conviction relief, in which he alleged

2

that he had been denied the effective assistance of counsel because his trial counsel ("Counsel") had failed to properly advise the Petitioner of the correct release eligibility dates during plea discussions and failed to call a key alibi witness, both of which prejudiced him.

At a hearing on this petition, the parties presented the following evidence: The Petitioner testified that Counsel had been appointed to represent him shortly after he was charged but that Counsel had met with him only "like two days prior to trial." The Petitioner said that, at that time, Counsel advised him that in the event he was convicted at trial, he would face a release eligibility of thirty-five percent. The Petitioner said that Counsel never mentioned a potential release eligibility date of eighty-five percent. The Petitioner further recounted a discussion with Counsel of a possible plea to aggravated robbery, in which they discussed a six-year sentence. The Petitioner alleged that, while Counsel had not mentioned a release eligibility date in that discussion, Counsel had told Petitioner that he would be Range II, which to the Petitioner's knowledge meant a thirty-five percent release eligibility date. The Petitioner further recounted a discussion with Counsel about the risks of going to trial versus accepting the plea offer and the consideration that the Petitioner would likely receive more time if convicted at trial. The Petitioner then testified that he had agreed to the six-year plea offer but that the offer had been "struck down" by the trial court.

The Petitioner identified two exhibits offered in support of his petition, one was the original judgment and the second was the amended judgment. He said that the original judgment reflected a thirty-five percent release eligibility date while the amended judgment reflected an eighty-five percent release eligibility date. The Petitioner further stated that, had he known that his release eligibility date would be eighty-five percent instead of thirty-five percent, he would not have proceeded to trial.

Upon questioning by the trial court, the Petitioner acknowledged that the State made no other offer other than the six-year offer that was not accepted by the trial court.

The Petitioner recounted that Counsel had told him that his chances of success at trial were good because the statements of witnesses Terry Ballard and Christopher Timberlake were inconsistent with each other. The Petitioner further stated that there were other witnesses who should have been called as alibi witnesses, two friends of the Petitioner and the Petitioner's wife, but Counsel had told the Petitioner that they didn't need them because "he felt like we had the case beat, so really didn't need any witnesses." The Petitioner said that, while Counsel had not pressured him to go to trial, "[h]e just didn't give me all of the knowledge that he should to make me choose better than to go to trial."

3

Asked for details regarding the Petitioner's statement that he had met with Counsel only once or twice, the Petitioner recalled that he had met with Counsel "a few times" in Marion County until December 31, 2013 and then not again until "I think somewhere in July [2014] like two or three days before trial." The Petitioner further testified that at this meeting he never mentioned to Counsel that his wife could testify as an alibi witness.

On cross-examination, the Petitioner agreed that Counsel had not affirmatively told him the six-year plea offer had a thirty-five percent release eligibility. Rather, the Petitioner testified that, "I figured [thirty-five], because that's what Range – I was Range II, so it's [thirty-five] percent." The Petitioner then, contradicting his earlier testimony, said that he in fact declined to take the six-year plea offer by the State. He said that he declined the offer thinking it was an offer for thirty-five percent release eligibility. He further stated that he would have declined the offer if it included an eighty-five percent release eligibility. The Petitioner testified that he would have taken the offer if he had known he was facing a potential sentence of twelve years at eighty-five percent. The Petitioner agreed that he was a convicted felon at the time of his plea.

The Petitioner said that he had been with his wife during the robbery but said that he did not know if his wife had ever discussed that fact with any law enforcement officer. When asked for clarification on this point, the Petitioner stated that, while they were seeing each other at the time, they had not discussed the fact that the Petitioner had been with her at the time of the robbery, despite the fact that the Petitioner had previously been convicted of a felony and was now facing a new aggravated robbery charge. The Petitioner further recounted that Counsel failed to call the Petitioner's wife, saying "He said we had the case beat so he didn't need to call my wife, because she was [in court]. He told her to miss work, that he was going to call her on the stand, but he never did."

Asked for specifics on the number of meetings he had with Counsel, the Petitioner testified that had met with him only "a couple" of times just before the trial and once after the Petitioner's probation revocation hearing. In further questioning, the Petitioner agreed that he had in fact met with Counsel both before and after the revocation hearing.

On re-direct examination regarding the plea offer, the Petitioner was asked whether it had been explained to him that he could either accept a plea offer for six years at eighty-five percent, or go to trial with a potential sentence of twelve to twenty years at eighty-five percent. The Petitioner responded "I would have never went to trial [twelve] to [twenty years] at [eighty-five] percent, that's most of my life, even with [twelve] years that's still like nine years."

On direct examination the Petitioner's wife said that she had been with the

4

Petitioner on the day of the robbery and that they had been together for the whole day except for two periods of time: (1) when the Petitioner left for about ten minutes to pick up a lottery ticket; and (2) a second period of about twenty minutes when the Petitioner left to pick up food.

On cross-examination, the Petitioner's wife testified that she never told law enforcement officers that the Petitioner was with her during the time of the crime. She said that she had told her sister and mother.

The Petitioner's wife recalled being present on occasions when Counsel was discussing the case with the Petitioner, but she said Counsel more often spoke with the Petitioner than he did with her. While she could not recall specifically what she might have told Counsel, she was sure that she had told him that the Petitioner could not have committed the robbery because he had been with her.

On re-direct examination, the Petitioner's wife confirmed that she had talked with Counsel, that she had been present at the trial, but that he had not called her as a witness.

On direct examination, Counsel testified that he had been a criminal defense attorney since November 2010 and had done criminal defense work in private practice and currently with the Public Defender's Office in Hamilton County. Counsel could not recall the first time that he met the Petitioner, but he said that he did recall representing the Petitioner both for the trial and for a parole violation hearing, which was based on the Petitioner's arrest for the aggravated robbery. While Counsel could not recall the exact number of times he and the Petitioner met regarding the parole hearing and subsequent trial, he was confident that it was more than two or three times and estimated it was eight to ten times. Counsel could not explain why the Petitioner would say they had met so infrequently.

Counsel further confirmed that he had been aware of the percentage release eligibility required on an aggravated robbery during his representation of the Petitioner, and he said that he had discussed the possible consequences of a guilty conviction or plea with the Petitioner.

Counsel recalled that the State initially offered the Petitioner a ten-year sentence, to be served at eighty-five percent. He said that he and the State's attorney discussed a two-year and a four-year offer, and the State asked Counsel to contact the trial court to see if he would approve such an agreement. Asked whether Counsel had ever suggested that the Petitioner could receive a thirty-five percent release eligibility for an aggravated robbery conviction, Counsel responded "I would not have told him that." Asked for further clarification, Counsel testified "You told me that he was saying that I told him

5

[thirty-five] percent on an aggravated robbery. I cannot ever recall telling him that, and that's something that I would not have told him at the time, because you know, it's not the first aggravated robbery I'd ever handled." Asked whether he discussed release eligibility with the Petitioner in conjunction with the State's original ten-year plea offer, Counsel responded "I would have discussed that. I don't specifically recall doing it, but it would have been my practice to cover that information."

Counsel was then questioned about alibi discussions and confirmed that he and the Petitioner had discussed possible alibi witnesses and his activities on the day of the robbery. Counsel recounted that the Petitioner told him that he had left the house twice to go to a local convenience store, and once again to pick up food from a fast food location. Counsel related they had a cash receipt from a fast food location for that day, but that the receipt just showed that someone had been there, not necessarily the Petitioner. Counsel testified that he had offered the Petitioner the option to testify about his location on the day of the robbery at trial and offered the Petitioner's wife the same opportunity. He said, however, that he had not called the Petitioner's wife to testify at trial for two reasons. First, Counsel testified that he was not comfortable with the story, in that it seemed contrived; and second, that the Petitioner's wife had texted Counsel immediately prior to or during the trial, advising him that she did not want to testify and was not comfortable in doing so.

Additionally, Counsel said he had not called the Petitioner's wife because she was not able to say that the Petitioner had been with her the whole time, saying "The alibi involved him leaving, and going off, and so to me it wasn't even a complete alibi." Asked if the Petitioner had suggested the names of any other possible alibi witnesses, Counsel could recall none.

On cross-examination, Counsel agreed that he did not remember specific release eligibility date discussions with the Petitioner, but that it would be his standard practice to have such discussions. Counsel also confirmed he had no contemporaneous notes or letters concerning plea discussions, possible sentences, or release eligibility dates with the Petitioner, and that rather, what Counsel was testifying to was his standard practice and not specifically his interaction with the Petitioner.

Counsel confirmed that Exhibit 1 was the original judgment entered in the Petitioner's case and that while Counsel had not prepared or seen the document, the original was marked at a thirty-five percent release eligibility date. Asked if that supported the Petitioner's contention that the Petitioner understood the aggravated robbery conviction was to be at thirty-five percent, Counsel said that he had not seen the document, but referred to a sentencing memorandum Counsel had filed with the court the day before the judgment was entered. Counsel agreed that Exhibit 2, the corrected

judgment, reflected the correct eighty-five percent release eligibility date.

Counsel offered the sentencing memorandum he had written the day before the sentencing hearing and judgment was entered as the best evidence that Counsel was aware of the eighty-five percent release eligibility date for aggravated robbery, quoting from paragraph (3) (b) in the memorandum as "[Petitioner] is a Range II Offender on his most serious conviction, aggravated robbery, he faces a non-probatable sentence of 12 to 20 years which must be served at 85 percent before parole eligibility."

Counsel recounted the plea discussions, including that he had not provided the State's two- and four-year offers in writing. Counsel also described the plea discussion as, "Those were the two days before the trial when [Assistant District Attorney] McGovern was in another trial, and so I'm in here waiting for a break, and he's writing me notes, and we're talking and sort of, chaotic, I guess."

With regard to potential testimony from the Petitioner's wife, Counsel clarified that his concern was not with her personal comfort, but rather because "I thought [her testimony] could hurt our chances to win the case. It's not because I wanted to protect anybody's feelings."

Responding to a question from the court, Counsel clarified that the Petitioner had not insisted that his wife take the stand and, after Counsel advised against it, did not ask Counsel to call her. Counsel stated, "If he had done that I probably would have just told her to deal with it and I'm calling you."

On recross-examination, Counsel confirmed that the Petitioner was incarcerated before the trial but said that he effectively communicated about cases with many incarcerated clients by phone. Asked if the decision not to call the Petitioner's wife had been a last-minute decision, Counsel confirmed that it was during or right before the trial that the decision was made not to call her, and therefore it was not a situation in which the Petitioner would have had a week or two to think about it and contact Counsel.

The Petitioner's post-conviction attorney argued it was ineffective of Counsel to misadvise the Petitioner regarding his release eligibility date. He said that Counsel had no documentation that "says anything other than specifically what happened with the Petitioner . . . ."

The Court questioned the Petitioner's post-conviction attorney as to whether there had been another plea offer made after the first had been rejected by the trial court, to which the eighty-five percent release eligibility would have applied, and the Petitioner's post-conviction attorney responded that "there's still a difference, your Honor, between

7

proceeding to trial when it's your understanding was it was going to be [thirty-five] percent anyway, versus continuing to work when you know it's going to be 85 percent." The Court noted that had Petitioner been misdirected as to thirty-five percent, that would have been more encouraging for him to take the plea offer, had that offer been accepted by the trial court. The Petitioner's post-conviction attorney responded that "[the Petitioner] shut down plea negotiations, because it was his understanding that the release eligibility date would be 35 percent." Asked by the Court if the Petitioner would have taken eighty-five percent, the Petitioner's post-conviction attorney replied that "He's rejecting offers based off of information that's just incorrect."

The Petitioner's post-conviction counsel then took issue with Counsel's decision not to call the Petitioner's wife as an alibi witness at trial, saying that the Petitioner's wife had testified that the Petitioner had been with her the whole day of the robbery, except for a couple of short periods and for about twenty minutes when the Petitioner went to the store. The Petitioner's post-conviction attorney characterized her potential testimony as "absolutely relevant to a jury's decision" in weighing the credibility of other witnesses. The court recounted Counsel's testimony that the Petitioner had not insisted or demanded that his wife take the stand and asked if that put the issue of potential testimony from his wife "back in [the Petitioner's] ballpark at that point." The court further asked whether the decision of whether to put the Petitioner's wife on the stand was strategic because "they may cut it off as completely unbelievable or [the witness] may not even say what [the Petitioner] thinks she's going to say." The Petitioner's post-conviction attorney opined that, since the Petitioner was facing a significant sentence, Counsel should have "erred on the side of [the Petitioner] and put [the Petitioner's wife] on the stand." The court acknowledged this opinion but observed that if they had called the Petitioner's wife and "what she was saying fell apart, you would be doing your client a disservice by having her put on the stand."

Based upon this evidence, the post-conviction court denied the Petitioner relief, finding that:

> It is more likely than not that Counsel advised the Petitioner of the 85 percent release eligibility attached to an aggravated robbery charge. Counsel is an experienced criminal attorney whose practice is always to advise of the length of sentence and range of punishment, and he stated he believes he advised the Petitioner in this case though he doesn't specifically remember. Counsel knows he didn't affirmatively tell the Petitioner he would receive a 35 percent release eligibility date as he certainly knows that would be an incorrect statement of law.

> Counsel did not place the Petitioner's wife on the stand because he

8

considered her to be a shaky witness at best and her testimony, even if believed, left open some gaps in time which might not support the alibi. It is further noted that the Petitioner did not insist on her testimony and that the witness did not want to testify. Counsel therefore made a tactical and strategic decision not to call the Petitioner's wife.

The Petitioner contends his attorney told him this was an easy case in an apparent effort to encourage the Petitioner not to plea. The Court simply finds the Petitioner was not credible on this point.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it denied his petition for post-conviction relief because Counsel's representation fell below the range of competence demanded of attorneys in criminal cases. Specifically, the Petitioner argues that Counsel was ineffective by communicating incorrect release eligibility dates to the Petitioner and overstating the likelihood of success at trial. He further contends that Counsel erred when he failed to call the Petitioner's wife as an alibi witness. The State counters that the Petitioner failed to demonstrate this claim by clear and convincing evidence. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee

Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a Petitioner in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a

10

different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 668.

Contrary to the Petitioner's assertion that Counsel had incorrectly advised him of a thirty-five percent release eligibility date for aggravated robbery, Counsel testified that while he did not recall the specific discussion of release eligibility with the Petitioner, his standard practice was to review all elements of potential sentences with his clients, and he would have done so for the Petitioner. Counsel was familiar with the release eligibility date requirements for a conviction of aggravated robbery, and he further supported his correct understanding of the release eligibility date with a contemporaneous pre-sentencing memorandum reflecting eighty-five percent release eligibility prepared just before the Petitioner's sentencing hearing. The post-conviction court found that Counsel was credible and that the Petitioner's testimony was not credible. The Petitioner has not proven by clear and convincing evidence that Counsel incorrectly told him of his release eligibility date. We agree that there was a clerical error on the Petitioner's original judgment, which was corrected in the amended judgment, but this document was created after the Petitioner had gone to trial. Further, there was no evidence of an outstanding plea offer that the Petitioner declined on the basis of his release eligibility dates, so he therefore did not prove prejudice in going to trial. Accordingly, we conclude that the post-conviction court did not err when it found the Petitioner was not entitled to post-conviction relief on these grounds.

Similarly, the Petitioner is not entitled to relief based on his assertion that Counsel failed to call the Petitioner's wife as an alibi witness at trial. Counsel testified that he had prepared the witness to testify but made a strategic decision not to call her to the stand because the alibi seemed contrived, included time gaps, and the witness texted him that she did not want to testify. Further, Counsel testified that had the Petitioner insisted that this alibi witness be called, Counsel would have done so, but the Petitioner did not insist that she be called. A petitioner is not entitled to relief on the grounds that a particular strategy or tactic failed or hurt the defense, if the choices are informed ones based upon

11

adequate preparation.  *See House*, 44 S.W.3d at 515.  The decision not to call the Petitioner's wife was a strategic choice made by Counsel based upon his concerns regarding her testimony and her willingness to testify.  This strategy did not render Counsel's representation ineffective.  The Petitioner is not entitled to relief.

### III.  Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE